IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY SHIPP, on his own behalf and on behalf of all others similarly situated,<br><br>                                  Plaintiff,<br><br>                v.<br><br>DAVID GOMEZ, as Warden of the Northern Reception and Classification Center, and ROB JEFFREYS, as Director of the Northern Reception and Classification Center,<br><br>                                 Defendants. | JURY TRIAL DEMANDED<br><br>Case No. _____<br><br>J. _____<br><br>Magistrate J. _____ |

## **COMPLAINT**

1. Plaintiff Gregory Shipp ("Plaintiff"), a resident in the Illinois Department of Corrections' ("IDOC") Northern Reception and Classification Center ("NRC") facility, brings this lawsuit in order to rectify the grave living conditions that he and others are forced to endure as prisoners in IDOC's custody.

2. The NRC houses approximately 1,000 prisoners, each of whom is experiencing ongoing violations of his Constitutional rights as a result of the living conditions at the NRC. The NRC is riddled with vermin and coated in hazardous mold. Plumbing blockages create sewage overflows from toilets and showers on a consistent basis, and prisoners receive inadequate portion sizes of rotten food of poor nutritional value. Prisoners also lack adequate cleaning supplies to combat the filth in their cells, including the inability to clean cell toilets that are covered in feces. These grave living conditions are compounded by the fact that prisoners are unable to exercise in their cell and have not received out of cell exercise time for months, meaning they are often forced

1

to spend almost 24 hours per day in their cells, leaving their cells only to take one to two showers per week.

3. The NRC's very name identifies the facility as a temporary "reception" center for prisoners before they are sent to other IDOC facilities. As a facility geared for temporary, short-term stays, the NRC is not designed to house prisoners for extended periods. The NRC lacks the education, vocational, and other programming that long-term IDOC facilities provide. However, many prisoners remain at the NRC for months. All the while, prisoners go without essential programming and are forced to endure these inhumane and unconstitutional conditions.

4. Plaintiff Gregory Shipp complains against Defendants Warden David Gomez and Director Rob Jeffreys and states as follows:

## NATURE OF ACTION

5. This is a civil action brought pursuant to the Eighth and Fourteenth Amendments of the United States Constitution to seek declaratory and injunctive relief under 42 U.S.C. § 1983, and to redress deprivations of Plaintiff's civil rights which were caused by the unconstitutional cruel and unusual punitive acts and omissions of the Defendants acting under the color of law.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343(a)(3). The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§§ 2201, 2202, and 2284.

7. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the United States District Court for the Northern District of Illinois because the facts giving rise to the claims in this Complaint occurred in this district.

## PARTIES

1. Plaintiff Gregory Shipp is a prisoner in the custody of the Illinois Department of Corrections, housed at Stateville's Northern Reception and Classification Center, 16830 IL-53, Crest Hill, IL 60403.

2. Defendant David Gomez is the current Warden of the NRC and is legally responsible for the health, safety, and sanitation of prisoner living conditions. Defendant David Gomez was the Warden of the NRC while Plaintiff was in custody there.

3. Defendant Rob Jeffreys is the current Director of the NRC and is legally responsible for the health, safety, and sanitation of prisoner living conditions. Defendant Rob Jeffreys was the Director of the NRC while Plaintiff was in custody there.

## CLASS ACTION ALLEGATIONS

4. In addition to his individual claims, Plaintiff brings his claim for prospective injunctive relief under the Due Process Clause of the Fourteenth Amendment on behalf of approximately 1,000 prisoners, all of whom are or were housed in the NRC at the time of the filing of Plaintiff's Complaint. A class action is proper pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

5. The class in this matter should be defined as all individuals incarcerated at the NRC at any time since January 1, 2020 and all the individuals who will be housed at the NRC in the future. This class excludes all individuals incarcerated at the Stateville Correctional Center who are not in the NRC, as well as all other facilities operated by the Illinois Department of Corrections.

6. The class is so numerous that joinder is impracticable. On information and belief, there are approximately 1,000 members of the class.

7. There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members. Here, Plaintiff challenges the inadequate prison conditions of the NRC.

8. Plaintiff's claims are typical of the claims of the class.

9. Plaintiff can fairly and adequately represent and protect the interests of the absent class members.

10. Separate injunctive and declaratory actions maintained by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, thereby establishing incompatible standards of conduct for the Defendants. Adjudication regarding the individual class members would, as a practical matter, be dispositive of, or impair the interests of, other members not parties to the adjudication or substantially impair their ability to protect their interests. *See, e.g.*, *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017).

11. Defendants have acted or refused to act on grounds generally applicable to the class the Plaintiff represents, thereby making final injunctive or declaratory relief appropriate for the class as a whole.

12. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### COUNT 1 – EIGHTH AMENDMENT VIOLATIONS
#### *Vermin Infestation*

13. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 12 of the Complaint.

14. At the NRC, vermin—including mice, rats, birds, and insects—infest the living spaces and common areas. Vermin are an everyday sight for prisoners. Mice run in and out of cells all night long. Cockroaches crawl up the walls, crawl into bedding, and bury themselves in commissary items. Gnats and flies swarm the pools of flooded water in common shower areas. Several varieties of insects cling to excess moisture in cell sinks and toilets—a condition which further exacerbates the insect infestation.

15. Vermin permeate the NRC. In the winter months, even more vermin pour into NRC to escape frigid outdoor air. NRC's poorly insulated exterior provides almost no barrier to the uptick in winter vermin. However, even outside of the winter months, vermin can be found throughout the NRC.

16. At night, the constant sound of mice running around inside prisoners' cells frustrates sleep. Prisoners have difficulty sleeping, and, as a result, suffer from compromised immune systems that leave them vulnerable to the disease and germs the mice spread throughout prisoners' cells and personal items. Vermin and their waste, which litters cells and common areas at the NRC, expose prisoners to dangerous respiratory infections, viruses, skin irritants, and other bacteria on a daily basis. Prisoners, who are already at risk of serious disease and struggle with compromised immune systems in the prison setting, face severe health dangers as a result.

17. As the Seventh Circuit recognizes: "The potential psychological harm from living in a small cell infested with mice and cockroaches is pretty obvious." *Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012). Within the confines of their cells, prisoners have no escape from the bugs and mice that crawl, scurry, and burrow in every corner. This sense of helplessness, on a day-to-day basis, degrades the psychological health of all prisoners who experience it.

18. Prisoners, on numerous occasions, complain about the constant, unsanitary presence of vermin at the NRC. NRC staff and leadership, however, have done nothing to address the roots of the widespread vermin infestations at the NRC that predate this Complaint by years.

19. Prisoners describe seeing no extermination services or vermin traps of any kind at the NRC. And to the extent the NRC pursues any extermination methods, those solutions are clearly insufficient and temporary given the constant presence of vermin at the NRC throughout the year. For example, on the rare occasions when exterminators are in the facility, they only exterminate in the common areas, which simply drives the vermin into prisoners' living areas. Within days, vermin have resumed their posts throughout the facility. The NRC officials have not addressed this pervasive infestation.

20. Without remedy, prisoners are forced to come up with creative, though ineffective, solutions to the vermin that plague their everyday life. Prisoners sacrifice limited clothing and bedding, as well as use stacks of books to clog cracks in the doors to their cells at night, in an attempt to stop mice from entering. This solution is only slightly effective. Prisoners regularly squash the bugs that crawl around their cells but must leave the smashed remains behind because they lack cleaning supplies with which to remove the dead vermin.

21. The NRC officials must address the unconstitutional conditions created by the vermin infestation. Infrequent extermination services are not enough, and Defendants' unwillingness to seriously address these conditions demonstrates a deliberate indifference to the prolonged deprivation of Plaintiff's constitutional rights. As the Seventh Circuit recognizes in the context of vermin infestations, "[k]nowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference." *See Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016).

### *Unsanitary and Deficient Plumbing*

22. The NRC's unsanitary and deficient plumbing poses a significant health risk to all NRC prisoners.

23. The NRC's plumbing—both in the cells and in the communal showers—malfunctions on a daily basis.

24. In cells, NRC prisoners must contend with cell toilets that do not flush and will back up causing raw sewage to overflow inside the cell, sometimes covering the floor with standing wastewater.

25. NRC prisoners also endure brown water that smells like sewage from cell sinks and frequently lack running water at all in both cell toilets and cell sinks.

26. The cell plumbing at the NRC is interconnected. Thus, if there is a plumbing issue with one cell sink or toilet, it likely will cause problems for the other sinks and toilets on the same plumbing line. For example, prisoners report that overflowing toilets in a neighboring cell cause their own cell toilet to overflow. At other times, cell toilets will flush all of the waste contents into a neighboring cell, causing the neighboring toilet to overflow.

27. When plumbing incidents like overflowing toilets occur, NRC staff refuse to provide cleaning supplies or towels to allow prisoners to clean up the sewage. Instead, prisoners are forced to use their own clothing or shower towels to clean up the sewage. When this happens, they are not provided with replacement clothing or shower towels.

28. The cell toilets are also covered in mold. Prisoners have reported having cell toilets covered in black mold, and others with green mold. One prisoner, in a cell with a black mold covered toilet, reported suffering from health issues on his groin and buttocks after his backside was sprayed with black moldy water from the cell toilet.

29. The cell toilets also back up into the cell sinks. This results in sewage in the sink—the same sink where prisoners are supposed to get their drinking water, brush their teeth, and wash their hands. This strongly suggests that there may be cross contamination of drinking water and wastewater.

30. There have been instances in which plumbing backed up in the kitchen and showers. In these instances, human feces were seen floating on the kitchen floor and in the flooded communal showers.

31. Additionally, the water the NRC makes available to its prisoners smells like sewage and has a faint, brown color. Staff and visitors are told to bring their own water. Staffers bring in gallon jugs for themselves. The NRC responds to prisoner complaints about the water by saying that the water is piped in from the City of Crest Hill and that the city's water is tested. On information and belief, that testing is done outside the prison. In other words, the water is tested before it passes through the NRC's ancient pipes.

32. In fact, the Illinois Environmental Protection Agency ("IEPA") reports dangerous levels of copper and lead in Stateville / NRC's water supply that are magnitudes higher than regulatory levels. The Maximum Contaminant Level ("MCL") for copper and lead are 1.3 milligrams per liter ("mg/L") and 0.015 mg/L, respectively. For the testing period of July 1, 2021 to December 31, 2021, IEPA tests revealed 3.17 mg/L of copper and 0.128 mg/L of lead in Stateville / NRC's water supply, nearly three times higher than the MCL for copper and over eight times higher than the MCL for lead.

33. Plumbing issues such as the backups described above effectively deprive prisoners of access to running water. There have been instances in which cells are without running water

for as long as 38 hours. When this occurs, prisoners have no way to wash their hands, cannot use their cell toilet, and lack adequate drinking water.

34. When the cells lack running water, prisoners are forced to cover the cell toilet with a towel to cover the sight and smell of the feces that are sitting in the toilet unflushed. When the water is shut off, prisoners are not allowed out of their cells to use a different toilet.

35. Additionally, there are widespread issues with the communal showers. Specifically, the communal showers are flooded with raw sewage on a daily basis, forcing prisoners to shower in contaminated water that can cause fungus and disease. For example, prisoners have contracted foot fungal infections from the showers.

36. In addition to the raw sewage, many of the showers are covered in mold and mildew.

37. There is also a lack of hot water in the communal showers on a weekly basis, including during the winter months. Prisoners are forced to take cold showers—in the middle of winter—or forego showers altogether. In some parts of the NRC, prisoners may go without hot water for as long as one month.

### *Rotten and Nutritionally Deficient Food*

38. Prisoners at NRC are forced to eat rotten and spoiled food or go hungry.

39. NRC routinely provides prisoners with undercooked and spoiled food, including spoiled chicken, hot dogs, and meat patties, as well as rotten and expired milk. Prisoners describe receiving the "Stateville special," a concoction of rotten chunks of meat with visible green patches, as well as seeing rodent feces in their food.

40. The food that NRC provides is foul smelling and ingesting it makes prisoners sick.

9

41. Prisoners frequently complain about spoiled and rotten food but are ignored by, or met with disdain from, correctional staff.

42. Not only is the food obviously spoiled, but also food is frequently undercooked, exposing prisoners to the risk of serious illness and preventing them from maintaining a nutritionally adequate diet. Prisoners have experienced food poisoning from the meals at NRC.

43. Prisoners who do eat the food are routinely forced to eat around moldy, rotten patches of food. Consequently, prisoners do not receive enough calories for a healthy diet.

44. Even when NRC provides edible food, the food is nutritionally deficient and the portion sizes too small. Prisoners estimate that they receive 1500 calories a day, describe rapid weight loss, and explain that they are almost always hungry due to the small portion sizes. In addition, prisoners are sometimes fed the same meal—cut up sausages—for breakfast, lunch, and dinner.

45. Further, limited access to commissary prevents them from obtaining other sources of nutrition. Indigent prisoners who cannot afford commissary must rely on the deficient food provided by the NRC for all of their nutrition.

46. As a result of this inadequate nutrition, prisoners report rapid weight loss. One prisoner reported losing almost 10% of his total body weight over four months.

### *Lack of Access to Cleaning Supplies*

47. Prisoners at NRC live in filth and lack adequate cleaning supplies to address the unclean conditions.

48. Prisoners are provided only a state-issued bar of soap once a week or once every other week to keep themselves and their cells clean.

49. If a prisoner wants to clean his cell, he must request bleach and a broom.

50. But prisoners report that obtaining cleaning supplies like bleach is difficult, and that whether they are given access to bleach is at the discretion of sympathetic correctional staff, who rarely grant prisoner requests. Prisoners report receiving cleaning supplies only two times in four months.

51. Cell toilets are particularly unclean. As noted above, the inadequate plumbing at the NRC frequently causes toilets to overflow, contaminating both the toilet and cell. Without any cleaning supplies—not even toilet brushes—to clean their toilets, prisoners' toilets are constantly foul and filthy.

52. When correctional staff refuse to provide bleach, prisoners are forced to clean the waste and water with their personal items, further contaminating their possessions and cells.

53. The prevalence of disease and dirt-carrying vermin exacerbate the squalid conditions in cells, making it harder for prisoners to keep their cells sanitary and clean because prisoners can only clean up after the vermin with the few, insufficient cleaning supplies they are provided.

### *Lack of Out of Cell Exercise Time*

54. Not only are prisoners forced to suffer in abhorrent living conditions, but their extreme lack of out of cell time prevents them from obtaining even small reprieves.

55. At the NRC, prisoners are supposed to be given yard time twice a week. But prisoners frequently report receiving yard time only approximately once a month. Since approximately November 2021, prisoners have not received any yard time.

56. Not only are prisoners not given any out of cell opportunity to exercise, but the cell sizes are also so small that prisoners are unable to perform any exercise in their cells. Prisoners report that there is only enough space to sit down and stand up in their cells.

57. There is no obvious reason for this lack of out of cell time: although prisoners report they are told it is due to quarantine restrictions, quarantine restrictions are not implemented in other settings.

58. As a consequence of their lack of yard time, prisoners essentially spend all hours of the day, every day, in their cells.

## VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

59. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 58 of the Complaint.

60. Plaintiff has rights protected under the Eighth and Fourteenth Amendments to the United States Constitution. These rights include the right to be free from cruel and unusual punishment, the right to due process, and the right to equal protection of the laws.

61. Plaintiff has exercised his constitutional right to be free from cruel and unusual punishment, his right to due process, and his right to equal protection of the laws by filing this lawsuit.

62. Defendants have violated Plaintiff's Constitutional rights by permitting the NRC to be overrun by vermin, neglecting to maintain adequate plumbing systems—which result in unsanitary and unsafe conditions, providing Plaintiff with spoiled and nutritionally-deficient food, failing to provide Plaintiff with adequate cleaning supplies to maintain his cell, and failing to provide necessary out of cell exercise time.

63. These prison officials have violated their duty to protect Plaintiff from these inadequate and hazardous prison conditions.

64. These Defendants possess actual knowledge of the inadequate and hazardous conditions, and they have impeded remedying preventable harm.

65. These Defendants possess the power to correct the inadequate and hazardous prison conditions Plaintiff has alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gregory Shipp asks this Honorable Court for Judgment against Defendants, and requests the following relief:

A) A Declaration that the acts and omissions of Defendants violated Plaintiff's constitutionally protected rights;

B) A Permanent Injunction prohibiting Defendants from taking further deliberate indifferent acts against Plaintiff;

C) Plaintiff's costs and fees in prosecuting this action.

Dated: February 17, 2022

Respectfully submitted,

PLAINTIFF GREGORY SHIPP

By: */s/ Terri L. Mascherin*
    Attorney for Plaintiff

Terri L. Mascherin (ARDC 6187735)
Benjamin J. Bradford (ARDC 6285800)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
312-222-9350
tmascherin@jenner.com
bbradford@jenner.com

Alan Mills (ARDC 6181054)
Nicole Schult (ARDC 6306949)
UPTOWN PEOPLE'S LAW CENTER
4413 N. Sheridan
Chicago, IL 60640
773-769-1411
alan@uplcchicago.org
nicole@uplcchicago.org

*Counsel for Plaintiff*