IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY SHIPP, CHRISTOPHER DIXON, ERIC JOHNSON, and ZACHARY JOHNSON, on their own behalf and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID GOMEZ, as Warden of the Northern Reception and Classification Center, and ROB JEFFREYS, as Director of the Northern Reception and Classification Center,<br><br>Defendants. | JURY TRIAL DEMANDED<br><br>Case No. 1:22-cv-00888<br><br>J. Robert M. Dow Jr.<br><br>Magistrate J. Gabriel A. Fuentes |

**FIRST AMENDED COMPLAINT**

1. Plaintiffs Gregory Shipp, Christopher Dixon, Eric Johnson, and Zachary Johnson ("Plaintiffs"), current residents at the Illinois Department of Corrections' ("IDOC") Northern Reception and Classification Center ("NRC") facility at the time of the filing of their respective claims, bring this lawsuit to rectify the grave living conditions that they and others are forced to endure as prisoners in IDOC's custody.

2. The NRC houses approximately 1,000 prisoners, each of whom is experiencing ongoing violations of his Constitutional rights because of the living conditions at the NRC. The NRC is riddled with vermin and coated in hazardous mold. Plumbing blockages create sewage overflows from toilets and showers on a consistent basis, and prisoners receive inadequate portion sizes of nutritionally deficient and rotten food. Prisoners also lack adequate cleaning supplies to combat the filth in their cells, including the inability to clean cell toilets that are covered in feces. These grave living conditions are compounded by the fact that prisoners are unable to exercise in

1

their cells and have only recently begun to receive inconsistent and limited yard time. Before the filing of the initial complaint in this matter, they received no out of cell exercise time for months. They were forced to spend almost 24 hours per day in their cells, leaving their cells only to take one or two showers per week.

3. The NRC's very name identifies the facility as a temporary "reception" center for prisoners before they are sent to other IDOC facilities. As a facility geared for temporary, short-term stays, the NRC is not designed to house prisoners for extended periods of time. The NRC lacks the education, vocational, and other programming that long-term IDOC facilities provide. However, many prisoners remain at the NRC for months. All the while, prisoners go without essential programming and are forced to endure these inhumane and unconstitutional conditions.

4. Plaintiffs Gregory Shipp, Christopher Dixon, Eric Johnson, and Zachary Johnson complain against Defendants Warden David Gomez and Director Rob Jeffreys and state as follows:

## NATURE OF ACTION

5. This is a civil action brought pursuant to the Eighth and Fourteenth Amendments of the United States Constitution to seek declaratory and injunctive relief under 42 U.S.C. § 1983, and to redress deprivations of Plaintiffs' civil rights which were caused by the unconstitutional cruel and unusual punitive acts and omissions of the Defendants acting under the color of law.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343(a)(3). The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201, 2202, and 2284.

7. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the United States District Court for the Northern District of Illinois because the facts giving rise to the claims in this Complaint occurred in this district.

## PARTIES

8. Plaintiff Gregory Shipp is a prisoner in the custody of the Illinois Department of Corrections housed at Hill Correction Center, 600 South Linwood Road, Galesburg, IL 61402 who was house at Stateville's Northern Reception and Classification Center, 16830 IL-53, Crest Hill, IL 60403 at the time of the filing of the original Complaint.

9. Plaintiffs Christopher Dixon, Eric Johnson, and Zachary Johnson are prisoners in the custody of the Illinois Department of Corrections housed at Stateville's Northern Reception and Classification Center, 16830 IL-53, Crest Hill, IL 60403 at the time of filing the Amended Complaint.

10. Defendant David Gomez is the current Warden of the NRC and is legally responsible for the health, safety, and sanitation of prisoner living conditions. Defendant David Gomez was the Warden of the NRC while Plaintiffs were in custody there.

11. Defendant Rob Jeffreys is the current Director of the NRC and is legally responsible for the health, safety, and sanitation of prisoner living conditions. Defendant Rob Jeffreys was the Director of the NRC while Plaintiffs were in custody there.

## CLASS ACTION ALLEGATIONS

12. Plaintiffs bring a claim for prospective injunctive relief under the Due Process Clause of the Fourteenth Amendment on behalf of approximately 1,000 prisoners, all of whom are or were housed in the NRC at the time of the filing of Plaintiffs' First Amended Complaint. A class action is proper pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

13. The class in this matter should be defined as all individuals incarcerated at the NRC at any time since January 1, 2020 and all individuals who will be housed at the NRC in the future. This class excludes all individuals incarcerated at the Stateville Correctional Center who are not at the NRC, as well as all other facilities operated by the Illinois Department of Corrections.

14. The class is so numerous that joinder is impracticable. On information and belief, there are approximately 1,000 members of the class.

15. There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members. Here, Plaintiffs challenge the inadequate prison conditions at the NRC.

16. Plaintiffs' claims are typical of the claims of the class.

17. Plaintiffs can fairly and adequately represent and protect the interests of the absent class members.

18. Separate injunctive and declaratory actions maintained by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, thereby establishing incompatible standards of conduct for the Defendants. Adjudication regarding the individual class members would, as a practical matter, be dispositive of, or impair the interests of, other members not parties to the adjudication or substantially impair their ability to protect their interests. *See, e.g.*, *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017).

19. Defendants have acted or refused to act on grounds generally applicable to the class the Plaintiffs represent, thereby making final injunctive or declaratory relief appropriate for the class as a whole.

20. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT 1 – EIGHTH AMENDMENT VIOLATIONS

### *Vermin Infestation*

21. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 12 of the First Amended Complaint.

22. At the NRC, vermin—including mice, rats, birds, and insects—infest the living spaces and common areas. Prisoners see vermin on a daily basis. Mice run in and out of cells all night long. Cockroaches crawl up the walls, crawl into bedding, and bury themselves in commissary items. Gnats and flies swarm the pools of flooded water in common shower areas. Several varieties of insects cling to excess moisture in cell sinks and toilets—a condition which further exacerbates the insect infestation.

23. Vermin permeate the NRC. In the winter months, even more vermin pour into NRC to escape frigid outdoor air. NRC's poorly insulated exterior provides almost no barrier to the uptick in winter vermin. However, even outside of the winter months, vermin can be found throughout the NRC.

24. At night, the constant sound of mice running around inside prisoners' cells frustrates sleep. Prisoners have difficulty sleeping, and, as a result, suffer from compromised immune systems that leave them vulnerable to the disease and germs the mice spread throughout prisoners' cells and personal items. Vermin and their waste, which litters cells and common areas at the NRC, expose prisoners to dangerous respiratory infections, viruses, skin irritants, and other

bacteria on a daily basis. Prisoners, who are already at risk of serious disease and struggle with compromised immune systems in the prison setting, face severe health dangers as a result.

25. As the Seventh Circuit recognizes: "The potential psychological harm from living in a small cell infested with mice and cockroaches is pretty obvious." *Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012). Within the confines of their cells, prisoners have no escape from the bugs and mice that crawl, scurry, and burrow in every corner. This sense of helplessness, on a day-to-day basis, degrades the psychological health of all prisoners who experience it.

26. Prisoners, on numerous occasions, complain about the constant, unsanitary presence of vermin at the NRC. NRC staff and leadership, however, have done nothing to address the causes of the widespread vermin infestations at the NRC that predate this Complaint by years.

27. Prisoners describe seeing no extermination services or vermin traps of any kind at the NRC. And to the extent the NRC pursues any extermination methods, those solutions are clearly insufficient and temporary given the constant presence of vermin at the NRC throughout the year. For example, on the rare occasions when exterminators are in the facility, they only exterminate in the common areas, which simply drives the vermin into prisoners' living areas. Within days, vermin have resumed their posts throughout the facility. The NRC officials have not addressed this pervasive infestation.

28. Without remedy, prisoners are forced to come up with creative, though ineffective, solutions to the vermin that plague their everyday life. Prisoners sacrifice limited clothing and bedding, as well as use stacks of books, to clog cracks in the doors to their cells at night, in an attempt to stop mice from entering. This solution is only slightly effective. Prisoners regularly squash the bugs that crawl around their cells but must leave the smashed remains behind because they lack cleaning supplies with which to remove the dead vermin.

29. The NRC officials must address the unconstitutional conditions created by the vermin infestation. Infrequent extermination services are not enough, and Defendants' unwillingness to seriously address these conditions demonstrates a deliberate indifference to the prolonged deprivation of Plaintiffs' constitutional rights. As the Seventh Circuit recognizes in the context of vermin infestations, "[k]nowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference." *See Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016).

### Unsanitary and Deficient Plumbing

30. The NRC's unsanitary and deficient plumbing poses a significant health risk to all NRC prisoners.

31. The NRC's plumbing—both in the cells and in the communal showers—malfunctions on a daily basis.

32. In cells, NRC prisoners must contend with cell toilets that do not flush and will back up causing raw sewage to overflow inside the cell, sometimes covering the floor with standing wastewater.

33. NRC prisoners also endure brown water that smells like sewage from cell sinks and frequently lack running water at all in both cell toilets and cell sinks. Numerous prisoners report tying rags and personal towels around leaky faucets at night to prevent them from dripping. By the morning, the NRC's water has turned these rags and towels into a rusty, red color.

34. The cell plumbing at the NRC is interconnected. Thus, if there is a plumbing issue with one cell sink or toilet, it likely will cause problems for the other sinks and toilets on the same plumbing line. For example, prisoners report that overflowing toilets in a neighboring cell cause

their own cell toilet to overflow. At other times, cell toilets will flush all of the waste contents into a neighboring cell, causing the neighboring toilet to overflow.

35. When plumbing incidents like overflowing toilets occur, NRC staff refuse to provide cleaning supplies or towels to allow prisoners to clean up the sewage. Instead, prisoners are forced to use their own clothing or shower towels to clean up the sewage. When this happens, they are not provided with replacement clothing or shower towels.

36. The cell toilets are also covered in mold. Prisoners have reported having cell toilets covered in black mold, and others with green mold. One prisoner, in a cell with a black mold covered toilet, reported suffering from health issues on his groin and buttocks after his backside was sprayed with black moldy water from the cell toilet.

37. The cell toilets also back up into the cell sinks. This results in sewage in the sink—the same sink where prisoners are supposed to get their drinking water, brush their teeth, and wash their hands. This strongly suggests that there may be cross contamination of drinking water and wastewater.

38. There have been instances in which plumbing backed up in the kitchen and showers. In these instances, human feces were seen floating on the kitchen floor and in the flooded communal showers.

39. Plumbing issues such as the backups described above effectively deprive prisoners of access to running water. There have been instances in which cells are without running water for as long as 38 hours. When this occurs, prisoners have no way to wash their hands, cannot use their cell toilet, and lack adequate drinking water.

40. When the cells lack running water, prisoners are forced to cover the cell toilet with a towel to cover the sight and smell of the feces that are sitting in the toilet unflushed. When the water is shut off, prisoners are not allowed out of their cells to use a different toilet.

41. Additionally, there are widespread issues with the communal showers. Specifically, the communal showers are flooded with raw sewage on a daily basis, forcing prisoners to shower in contaminated water that can cause fungus and disease. For example, prisoners have contracted foot fungal infections from the showers.

42. In addition to the raw sewage, many of the showers are covered in mold and mildew.

43. There is also a lack of hot water in the communal showers on a weekly basis, including during the winter months. Prisoners are forced to take cold showers—in the middle of winter—or forego showers altogether. In some parts of the NRC, prisoners may go without hot water for as long as one month.

44. Additionally, the running water at the NRC, which is normally prisoners' only source of water, smells like sewage and has a faint, brown color. Staff and visitors are told to bring their own water. Staff members bring in gallon jugs of water for themselves. The NRC responds to prisoner complaints about the water by saying that the water is piped in from the City of Crest Hill and that the city's water is tested. On information and belief, that testing is done outside the prison. In other words, the water is tested before it passes through the NRC's ancient pipes.

45. In fact, the Illinois Environmental Protection Agency ("IEPA") reports dangerous levels of copper and lead in Stateville / NRC's water supply that are magnitudes higher than regulatory levels. The Maximum Contaminant Level ("MCL") for copper and lead are 1.3

milligrams per liter ("mg/L") and 0.015 mg/L, respectively. For the testing period of July 1, 2021 to December 31, 2021, IEPA tests revealed 3.17 mg/L of copper and 0.128 mg/L of lead in Stateville / NRC's water supply, nearly three times higher than the MCL for copper and over eight times higher than the MCL for lead.

46. On March 11, 2022, IDOC issued a press release confirming the presence of Legionella bacteria at Stateville and Joliet Treatment Center. IDOC's press release did not specify whether the presence of Legionella bacteria had been detected at both Stateville Correctional Center, NRC's parent institution, and at NRC. Legionella bacteria can cause Legionnaires' disease, which can cause headaches, muscle aches, fevers, gastrointestinal issues such as vomiting and diarrhea, chest pain and shortness of breath, and long-term neurological damage such as memory loss and difficulty with concentration.

47. On information and belief, IDOC also issued an internal memorandum to prisoners at NRC notifying them of the Legionella outbreak, but the memorandum told prisoners that the outbreak was limited to S Wing and two other unoccupied wings at NRC. The memorandum did not specify whether all of the water at the NRC had been tested for Legionella or for how long the Legionella outbreak went undetected.

48. Since reporting the Legionella outbreak, the NRC has not supplied prisoners with bottled water on a consistent basis. Indeed, several prisoners report that the NRC has not handed out any alternative drinking water sources since they received notice of the bacteria outbreak. As a result, prisoners are forced to either drink water that may be contaminated with Legionella or go without drinking water entirely. One prisoner reported that the only liquids they drink, out of fear of contracting Legionnaires' disease, are the small containers of milk and juice that are provided with meals.

49. The memorandum instructed prisoners to seek medical attention if they experienced headaches, muscle aches, or stomachaches, as those symptoms are associated with Legionnaires' disease. However, prisoners continue to report difficulty obtaining medical attention when they experience those symptoms.

### *Rotten and Nutritionally Deficient Food Prepared in an Unsanitary Kitchen*

50. Prisoners at NRC are forced to eat rotten and spoiled food or go hungry.

51. NRC routinely provides prisoners with undercooked and spoiled food, including spoiled chicken, hot dogs, and meat patties, as well as rotten and expired milk. Prisoners describe receiving the "Stateville special," a concoction of rotten chunks of meat with visible green patches, as well as seeing rodent feces in their food.

52. The food that NRC provides is foul smelling and ingesting it makes prisoners sick.

53. Prisoners frequently complain about spoiled and rotten food but are ignored by, or met with disdain from, correctional staff.

54. Not only is the food obviously spoiled, but also food is frequently undercooked, exposing prisoners to the risk of serious illness and preventing them from maintaining a nutritionally adequate diet. Prisoners have experienced food poisoning from the meals at NRC.

55. Prisoners who do eat the food are routinely forced to eat around moldy, rotten patches of food. Consequently, prisoners do not receive sufficient calories.

56. Even when NRC provides edible food, the food is nutritionally deficient and the portion sizes are too small. Prisoners estimate that they receive 1500 calories a day, describe rapid weight loss, and explain that they are almost always hungry due to the small portion sizes. In addition, prisoners are sometimes fed the same meal—cut up sausages—for breakfast, lunch, and dinner.

57. Further, limited access to commissary prevents them from obtaining other sources of nutrition. Indigent prisoners who cannot afford commissary must rely on the deficient food provided by the NRC for all of their nutrition.

58. As a result of this inadequate nutrition, prisoners report rapid weight loss. Several prisoners reported losing a significant amount of their total body weight.

59. Not only is the food nutritionally deficient, spoiled, rotten, and inadequate, but the kitchen at NRC is unsanitary, which creates a continuous and high risk of foodborne illness for prisoners.

60. The kitchen for the NRC is full of cockroaches and mice, including in the dry storage areas and on food service and food preparation tables. Cockroaches often crawl on the pots and pans used to prepare prisoner meals, and the cookware is not then cleaned again before use.

61. There is extensive mold throughout the kitchen, including in the food storage areas and on the floors.

62. Food is often left out of the refrigerator after it is prepared and before it is delivered to prisoners to consume. While the food is sitting out, it is left uncovered and roaches and mice often crawl on the food. This results in food containing vermin or their feces being delivered to prisoners.

63. These food contamination conditions have been reported to kitchen supervisors. The supervisors instruct that the food should be served anyway.

### *Lack of Access to Cleaning Supplies*

64. Prisoners at NRC live in filth and lack adequate cleaning supplies to address the unclean conditions.

65. Prisoners are provided only a state-issued bar of soap once a week or once every other week to keep themselves and their cells clean.

66. If a prisoner wants to clean his cell, he must request bleach and a broom.

67. But prisoners report that obtaining cleaning supplies like bleach is difficult, and that whether they are given access to bleach is at the discretion of sympathetic correctional staff, who rarely grant prisoner requests. Prisoners report receiving cleaning supplies only two times in four months.

68. Cell toilets are particularly unclean. As noted above, the inadequate plumbing at the NRC frequently causes toilets to overflow, contaminating both the toilet and cell. Without any cleaning supplies—not even toilet brushes—to clean their toilets, prisoners' toilets are constantly foul and filthy.

69. When correctional staff refuse to provide bleach, prisoners are forced to clean the waste and water with their personal items, further contaminating their possessions and cells. For example, prisoners report using shampoo to attempt to clean the black mold that lines the walls of their cells.

70. The prevalence of disease and dirt-carrying vermin exacerbate the squalid conditions in cells, making it harder for prisoners to keep their cells sanitary and clean because prisoners can only clean up after the vermin with the few, insufficient cleaning supplies they are provided.

### *Lack of Out of Cell Exercise Time*

71. Not only are prisoners forced to suffer in abhorrent living conditions, but their extreme lack of out of cell time prevents them from obtaining even small reprieves.

72. At the NRC, prisoners are supposed to be given yard time twice a week. But prisoners frequently report receiving yard time only approximately once a month. On information and belief, from approximately early fall 2021 to spring 2022 prisoners did not receive any yard time. One prisoner who arrived at NRC in November 2021 reported that he did not see daylight again for three months after his arrival.

73. NRC has only recently started to provide yard time after months of no out of cell time. However, yard time remains inconsistent and limited, and is frequently cancelled. Prisoners continue to spend the overwhelming majority of their time locked in their cells for days on end.

74. Not only are prisoners not given any out of cell opportunity to exercise, but the cells are also so small that prisoners are unable to exercise in their cells. Prisoners report that there is only enough space to sit down and stand up in their cells.

75. There is no obvious reason for this lack of out of cell time: although prisoners report being told the lack of out of cell time is due to quarantine restrictions, quarantine restrictions are not implemented in other settings.

76. As a consequence of their lack of yard time, prisoners essentially spend all hours of the day, every day, in their cells.

## VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS

77. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 63 of the First Amended Complaint.

78. Plaintiffs have rights protected under the Eighth and Fourteenth Amendments to the United States Constitution. These rights include the right to be free from cruel and unusual punishment, the right to due process, and the right to equal protection of the laws.

79. Plaintiffs have exercised their constitutional rights to be free from cruel and unusual punishment, their right to due process, and their right to equal protection of the laws by filing this lawsuit.

80. Defendants have violated Plaintiffs' Constitutional rights by permitting the NRC to be overrun by vermin, neglecting to maintain adequate plumbing systems—which result in unsanitary and unsafe conditions, providing Plaintiffs with spoiled and nutritionally-deficient food, failing to provide Plaintiffs with adequate cleaning supplies to maintain their cells, and failing to provide necessary out of cell exercise time.

81. These prison officials have violated their duty to protect Plaintiffs from these inadequate and hazardous prison conditions.

82. These Defendants possess actual knowledge of the inadequate and hazardous conditions, and they have impeded remedying preventable harm.

83. These Defendants possess the power to correct the inadequate and hazardous prison conditions Plaintiffs have alleged in this First Amended Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Gregory Shipp, Christopher Dixon, Eric Johnson, and Zachary Johnson asks this Honorable Court for Judgment against Defendants, and request the following relief:

A) A Declaration that the acts and omissions of Defendants violated Plaintiffs' constitutionally protected rights;

B) A Permanent Injunction prohibiting Defendants from taking further deliberate indifferent acts against Plaintiffs;

C) Plaintiffs' costs and fees in prosecuting this action.

Dated: March 24, 2022

Respectfully submitted,

PLAINTIFFS GREGORY SHIPP, CHRISTOPHER DIXON, ERIC JOHNSON, AND ZACHARY JOHNSON

By: */s/ Terri L. Mascherin*
    Attorney for Plaintiff

Terri L. Mascherin (ARDC 6187735)
Benjamin J. Bradford (ARDC 6285800)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
312-222-9350
tmascherin@jenner.com
bbradford@jenner.com

Alan Mills (ARDC 6181054)
Nicole Schult (ARDC 6306949)
UPTOWN PEOPLE'S LAW CENTER
4413 N. Sheridan
Chicago, IL 60640
773-769-1411
alan@uplcchicago.org
nicole@uplcchicago.org

*Counsel for Plaintiff*

| Summary Report | |
|---|---|
| Title | **pdfDocs compareDocs Comparison Results** |
| Date & Time | 3/28/2022 12:38:18 PM |
| Comparison Time | 1.81 seconds |
| compareDocs version | v5.1.300.3 |

| Sources | |
|---|---|
| Original Document | CHICAGO-#3060378-v7-UPLC_Complaint_(filed).docx |
| Modified Document | CHICAGO-#3060378-v17-UPLC_Complaint_(amended).docx |

| Comparison Statistics | |
|---|---|
| Insertions | 35 |
| Deletions | 16 |
| Changes | 122 |
| Moves | 6 |
| Font Changes | 0 |
| Paragraph Style Changes | 0 |
| Character Style Changes | 0 |
| TOTAL CHANGES | 179 |
| | |
| | |
| | |

| Word Rendering Set Markup Options | |
|---|---|
| Name | Standard |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Font Changes | |
| Paragraph Style Changes | |
| Character Style Changes | |
| Inserted cells | |
| Deleted cells | |
| Merged cells | |
| Changed lines | Mark left border. |

| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after saving | General | Always |
| Report Type | Word | TrackChanges |
| Character Level | Word | False |
| Include Comments | Word | False |
| Include Field Codes | Word | True |
| Flatten Field Codes | Word | True |
| Include Footnotes / Endnotes | Word | True |
| Include Headers / Footers | Word | True |
| Image compare mode | Word | Insert/Delete |
| Include List Numbers | Word | True |
| Include Quotation Marks | Word | False |
| Show Moves | Word | True |
| Include Tables | Word | True |
| Include Text Boxes | Word | True |
| Show Reviewing Pane | Word | True |
| Summary Report | Word | End |
| Detail Report | Word | Separate (View Only) |
| Document View | Word | Print |