IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY SHIPP; CHRISTOPHER DIXON; ZACHARY JOHNSON; LARNELL BROWN; and ERIC TYLER, on their own behalf and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 22 C 888 |
| v. | ) ) | |
| CHARLES TRUITT, as Warden of the Northern Reception and Classification Center; and LATOYA HUGHES, as Acting Director of the Northern Reception and Classification Center, | ) ) ) ) ) ) ) ) | Magistrate Judge Maria Valdez |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Due Process Claim (Count II) [Doc. No. 146]. For the reasons that follow, the motion is granted.

## BACKGROUND

Plaintiffs' claim for prospective injunctive relief is brought on behalf of inmates housed at the Illinois Department of Corrections' ("IDOC") Northern Reception and Classification Center ("NRC"). Plaintiffs propose a class of individuals incarcerated at the NRC at any time since May 1, 2021, and all individuals who will be housed there in the future. The six named Plaintiffs are or

were prisoners in IDOC custody and were housed at the NRC at various times between 2021 and 2024. They allege that Defendants – the Warden of the NRC and the Acting Director of IDOC – violated the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment by forcing inmates to endure restrictive and unsanitary conditions of confinement at the NRC.

The following relevant facts from the Third Amended Complaint are treated as true for the purposes of this motion. *See Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022). Vermin, including mice, birds, and insects, infest the living areas and common spaces at the NRC, including the food preparation and storage areas, exposing prisoners to disease and other health problems. To the extent that Defendants have tried to eradicate the presence of vermin, those efforts have been insufficient and have caused additional problems when exterminated animals are left to decay in common areas.

The NRC also has unsanitary and deficient plumbing, which malfunctions daily. Cell toilets regularly back up, causing raw sewage to back up into the cell and/or the cell sinks; odorous brown water flows from the cell sinks; faucets and toilets either lack running water or leak; sewage has been seen to back up in the kitchen and showers; mold and mildew covers showers and toilets; the showers regularly lack hot water, for as long as a month at a time; and water testing has shown the presence of dangerous levels of various contaminants and bacteria, but prisoners are not consistently given bottled water to drink. Because the plumbing at the NRC is interconnected, problems with one cell's sink or toilet can affect those in

nearby cells. When plumbing or vermin issues soil their cells, prisoners are not provided with adequate cleaning supplies, so they often have to use their own clothing or towels to deal with the problem. They are not provided with replacements for the soiled items.

Prisoners are forced to remain in their filthy cell conditions for unusually long periods of time because they are only given yard time approximately once a month, contrary to NRC policy, which provides that inmates are to receive ten to twenty hours of out-of-cell time per week. NRC offers no programming and was built without any common areas, and the cells are too small to exercise in. From fall 2021 to spring 2022, prisoners did not receive any yard time at all. If they do not get yard time, prisoners are in their cells nearly twenty-four hours a day, except for occasional showers. Yard time began to be provided again in March 2022, but it remains inconsistent, limited, and is frequently cancelled, even though pandemic quarantine restrictions no longer exist. Out of cell time is now cancelled due to a lack of security personnel.

Inmates at NRC are unable to adequately file grievances to complain about the conditions. Grievance forms are not available, contrary to IDOC's policies; they take too long to process, due to a large backlog; and grievances regularly do not get answered at all. Plaintiffs have no means to contest their conditions at a hearing.

Count I of Plaintiffs' complaint alleges that the conditions of confinement deny them the minimal civilized measures of life's necessities, in violation of the Eighth Amendment; and Count II alleges violations of their liberty and property

interests guaranteed by the Due Process Clause of the Fourteenth Amendment. Defendants have moved to dismiss Count II of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## **DISCUSSION**

When considering a motion to dismiss, Rule 12(b)(6) requires a court to accept all of a plaintiff's well-pleaded facts as true as well as reasonable inferences drawn therefrom. *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009). A plaintiff must provide a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to defeat a motion to dismiss. Fed. R. Civ. P. 8(a)(2); *see Bell Atl. v. Twombly,* 550 U.S. 544, 555 (2007). The complaint need not plead all specifics, but it must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678 (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"); *Smith v. Garland*, 103 F.4th 1244, 1251-52 (7th Cir. 2024) ("While all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff, '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'") (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)).

Defendants have moved to dismiss Count II, which alleges due process violations, on the basis that claims of unconstitutional conditions of confinement for incarcerated individuals may only be brought under the Eighth Amendment.

4

Plaintiffs respond that their allegations are sufficient to state a procedural due process claim.

The Due Process Clause of the Fourteenth Amendment "protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393, 162 L. Ed. 2d 174 (2005). The clause prevents pretrial detainees from being "punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Eighth Amendment, on the other hand, shields prisoners who are incarcerated after a guilty finding from cruel and unusual punishment, "which requires a showing of both an objectively unreasonable deprivation of rights and subjective deliberate indifference." *Kemp v. Fulton County*, 27 F.4th 491, 495 (7th Cir. 2022) ("The difference in standards stems from the fact that pretrial detainees remain entitled to the presumption of innocence, and so the constitution protects them from any *punishment* for the acts that led to their detention.") (emphasis in original).

In determining whether there has been a due process violation, a court must first "identify the protected property or liberty interest at stake. Second, it must determine what process is due under the circumstances." *Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013). Plaintiffs claim

5

they were deprived of liberty when Defendants placed them into *de facto* segregation without due process.[1]

Despite their incarcerated status, prisoners retain some liberty interests. The Supreme Court has held that prisoners have a liberty interest in avoiding disciplinary segregation when that segregation restrains the inmates' freedom in a manner that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citations omitted); *see Lekas v. Briley*, 405 F.3d 602, 607-08 (7th Cir. 2005) ("In the absence of such 'atypical and significant' deprivations, the procedural protections of the Due Process Clause will not be triggered.").

In determining what constitutes atypical and significant hardship, courts are directed to compare the deprivation with those found in discretionary segregation and the general prison population. *See Lekas*, 405 F.3d at 608. However, the "key comparison is between disciplinary segregation and nondisciplinary segregation rather than between disciplinary segregation and the general prison population." *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997). Conditions within the

---

[1] Plaintiffs also assert that the filthy conditions required them to use their own items – including body soap, towels, and clothing – to clean their cells and to cover open spaces to prevent vermin infestation. Plaintiffs allege they were thus deprived of their property "as a result of Defendants' deliberate indifference to the abhorrent condition of their cells." (Pls.' Resp. at 14.) But the case Plaintiffs cite explains only that deprivation of personal care items and other health and comfort necessities could violate the Eighth Amendment, not that inmates have property interests in those items for purposes of the Due Process Clause. *See Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007). Plaintiffs also provide no supporting case law for the proposition that voluntarily using their property to clean equates to being deprived of those items. *Cf. Manistee Apartments, LLC v. City of Chi.*, 844 F.3d 630, 633 (7th Cir. 2016) ("[V]oluntary payment is not a property deprivation.").

6

general population have been described as "inevitably subsumed" by the conditions in discretionary segregation because "any member of the general prison population is subject, without remedy, to assignment to administrative segregation or protective custody at the sole discretion of prison officials, . . . if for no other reason than to alleviate over-crowding concerns within the prison." *Lekas*, 405 F.3d at 609. Accordingly, "the conditions of discretionary segregation provide the most apt benchmark for assessing whether the nature of a plaintiff's confinement in disciplinary segregation works 'a major disruption in his environment.'" *Id.*

Plaintiffs tacitly acknowledge that they are not held in a formal segregation status. Instead, the complaint coins the term "*de facto* segregation," describing it as "atypical and significantly more restrictive than any other prison in Illinois." (Pls.' Resp. at 5.) Calling it "*de facto* segregation" creatively avoids describing the segregation as either "disciplinary" or "discretionary," but to the extent Plaintiffs were in any form of segregation, it was discretionary. Plaintiffs do not allege that the segregation is disciplinary or punitive in character; to the contrary, their out-of-cell time was originally suspended due to pandemic quarantine restrictions, and after those restrictions were lifted, the *de facto* segregation continued due to insufficient staffing. (*See, e.g.,* 3rd Am. Compl. ¶¶ 151-52.) Plaintiffs further admit that they were placed in *de facto* segregation "without any provoking incident, simply due to Defendants' deliberate indifference" or "simply for Defendants' convenience." (Pls.' Resp. at 7.)

7

Placement in discretionary segregation "does not constitute a deprivation of a liberty interest." *Lekas*, 405 F.3d at 609. The Seventh Circuit has made it clear that segregation to deal with issues of overcrowding or disease is at the sole discretion of prison officials, and prisoners have no remedy. *See Wagner*, 128 F.3d at 1176 ("Every state must have somewhere in its prison system single-person cells in which prisoners are sometimes confined not because they have misbehaved but simply because the prison has no other space, wishes to protect some prisoners from others, wishes to keep prisoners isolated from one another in order to minimize the risk of riots or other disturbances, wishes to prevent the spread of disease, and so forth.").

But even if the alleged segregation were considered to be disciplinary, the complaint alleges that all prisoners held in the NRC were subjected to the same conditions. Thus, the deprivations by definition were not "atypical and significant" in comparison to ordinary prison life. An allegation that conditions throughout the prison were equally infirm for all prisoners makes out a claim for an Eighth Amendment violation, but it is fatal to their due process claim. *See Lekas*, 405 F.3d at 609.

Plaintiffs alternatively argue that the combination of *de facto* segregation and unconstitutional conditions of confinement states a claim for a denial of procedural due process. *See Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009) ("In a number of other cases, we have explained that a liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh.") (emphasis

8

in original). Poor conditions by themselves do not amount to a due process violation; they only provide evidence that the deprivations of segregation were "harsher than those in the normal prison environment." *See id.* at 698. Plaintiffs, on the other hand, allege they were held in conditions identical to those in the normal prison environment. In the complaint, *de facto* segregation is simply one example of the harsh conditions suffered by all inmates.

Other allegations and arguments also suggest that Plaintiffs' due process claim is merely a restatement of their Eighth Amendment count. For example, Plaintiffs do not enumerate, in their complaint or motion, what process could be due in these circumstances. They allege there is no effective grievance system or other means by which inmates could complain about their conditions, but even a perfectly functioning grievance system would only allow inmates to remedy poor conditions; it would not provide any due process in advance of the allegedly unconstitutional deprivation. Plaintiffs claim they "have rights under the Due Process Clause of the Fourteenth Amendment to a hearing in front of an impartial tribunal to appeal Defendants' decisions resulting in these horrific conditions," (3d Am. Compl. ¶ 226), but they acknowledge that there are no *decisions* to be appealed because inmates "are not intentionally placed in any 'administrative segregation,' but are instead placed in conditions that constitute segregation without any provoking incident, simply due to Defendants' deliberate indifference." (Pls.' Resp. at 7.) Similarly, Plaintiffs' allegation that Defendants' conduct was "objectively unreasonable and undertaken with deliberate indifference," (3rd Am. Compl. ¶ 231), belies the fact

9

that Plaintiffs seek any form of improved procedure, rather than a remedy for unconstitutional conditions. Deliberate indifference is an element of an Eighth Amendment claim, not a due process violation. *See Pittman by and through Hamilton v. Madison, County, Ill.*, 108 F.4th 561, 566 (7th Cir. 2024).

The Court finds that Plaintiffs have failed to state a due process claim upon which relief can be granted, and furthermore that they cannot cure the infirmity through yet another amendment to the complaint. "[T]he fatal deficiency in [Plaintiffs'] complaint is not that it alleges too little, but that it alleges too much." *Lekas*, 405 F.3d at 613 (affirming dismissal of a due process claim where the plaintiff alleged conditions of disciplinary segregation "completely indistinguishable from conditions of discretionary segregation"). The allegations "reveal that [Plaintiffs have] not been deprived of a liberty interest," and thus they are "deprive[d] of any ground on which to invoke the protections of procedural due process." *Id.* This outcome may appear harsh, but Plaintiffs are not left without a means to redress their claims of unconstitutional conditions. The alleged deprivations are best analyzed under the Eighth Amendment, which they have properly pleaded in Count I of their complaint. *See Townsend v. Fuchs*, 522 F.3d 765, 772 (7th Cir. 2008).

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Due Process Claim (Count II) [Doc. No. 146] is granted with prejudice.

**SO ORDERED.**            **ENTERED:**

**DATE: February 18, 2025**

           **HON. MARIA VALDEZ**
           **United States Magistrate Judge**