**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY SHIPP; CHRISTOPHER DIXON; ZACHARY JOHNSON; LARNELL BROWN; and ERIC TYLER, on behalf of themselves and others similarly situated,** | ) | **No. 22 C 888** |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Magistrate Judge Maria Valdez** |
| **MINDI NURSE and LATOYA HUGHES, in their official capacities,**[1] | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs brought this suit on behalf of themselves and a certified class, alleging they suffered unconstitutional conditions of confinement in violation of the Eighth Amendment while they were in the custody of the Illinois Department of Corrections' ("IDOC" or "Department") Northern Reception and Classification Center ("NRC"). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

On November 14, 2025, a class was certified under Federal Rule of Civil Procedure 23(b)(2), comprising all individuals incarcerated at NRC at any time

[1] Nurse and Hughes are substituted for their predecessors pursuant to Federal Rule of Civil Procedure 25(d).

since May 1, 2021, and all individuals who will be housed there in the future, related to the following allegedly unconstitutional conditions: (1) vermin infestation in the kitchen and food storage areas; (2) contaminated water; (3) practices related to the prevention of food spoilage and/or contamination; (4) out-of-cell time; and (5) the nutritional sufficiency of the baseline diet offered to all prisoners.

Defendants have filed a Motion for Summary Judgment [Doc. No. 201] and Motion to Exclude Expert Testimony and Reports of Dr. Mitchel K. Holliday [Doc. No. 203]. For the reasons that follow, the motion to exclude is denied, and the motion for summary judgment is granted.

## DISCUSSION

## I. MOTION TO EXCLUDE EXPERT TESTIMONY

Along with their motion for summary judgment, Defendants filed a Motion to Exclude Expert Testimony and Reports of Dr. Mitchel K. Holliday [Doc. No. 203]. Defendants complain that in the evening before Dr. Holliday's deposition was scheduled to take place, Plaintiffs sent Defendants an undated Supplemental List of Materials Considered ("Supplemental Statement"), in which Dr. Holliday stated that his initial report, submitted more than three months earlier, failed to identify certain materials he considered in making the report. The omitted materials included two deposition transcripts, the NRC menu for fiscal year 2024, inspection memoranda, and documents related to nutritional review of the 2024 and 2025 menus. In addition, Dr. Holliday said that after his report was disclosed, he reviewed and considered 353 pages of photographs and a deep cleaning schedule,

and he reserved the right to rely on those materials in furtherance of his previously disclosed opinions.

When asked at his deposition the following morning why he failed to cite the documents in the Supplemental Statement, Dr. Holliday responded: "Bad referencing." He and Plaintiffs' counsel also gave confusing explanations about how and when he discovered that the materials were not included in the report. Furthermore, Dr. Holliday did not describe the nature of his reliance on the listed materials in the Supplemental Statement or during his testimony. He also suggested that there may have been other documents omitted that were not included in the Supplemental Statement.

Federal Rule of Civil Procedure 26(a)(2) requires written expert reports to be accompanied by, among other things, the reasons for their opinions, all facts or data the expert considered in forming their opinions, as well as any exhibits that will be used in support. *See* Fed. R. Civ. P. 26(a)(2)(B). If a party fails to provide information as required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The determination of whether the failure to disclose is justified or harmless is within the discretion of the court, and explicit findings are not required. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). Factors to be considered include: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the

prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

The Supplemental Statement was not disclosed until after Defendants' rebuttal expert report was due, on the eve of Dr. Holliday's deposition. Defendants argue they were prejudiced by expending time and expense in rebutting an incomplete report and by being forced to depose Dr. Holliday without the benefit of all information on which he relied. For those reasons, had Defendants filed a relevant motion around the time of the late submission, it would almost certainly have been granted. The failure to disclose could have been easily cured by extending the deadline for the rebuttal report and/or Dr. Holliday's deposition, or by allowing Dr. Holliday to be re-deposed on the belated disclosures alone. Instead, Defendants sat on their rights and did not seek to enforce Rules 26 or 37 for nearly a year. The fact that Defendants did not timely seek such relief indicates that they did not believe the Supplemental Statement was problematic or required a cure, and thus the failure to disclose must be deemed harmless. Dr. Holliday's report will not be excluded.

## II. FACTS[2]

NRC is located in the town of Crest Hill, in Will County, Illinois. (Defs.' LR 56.1(a)(2) ¶ 2.) NRC functions as the major adult male intake and processing unit for the state of Illinois. Convicted prisoners arrive at NRC before being sent to a

[2] Unless otherwise noted, the material facts are either undisputed or deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *Malec v. Sanford*, 191 F.R.D. 581, 583-84 (N.D. Ill. 2000).

longer-term institution within the state. In addition, NRC provides temporary housing for individuals transferred to the Chicago area for other reasons, such as attending court hearings or medical appointments. Because of NRC's role within IDOC as a reception center, it is designed for short-term stays. (*Id.* ¶¶ 3-4, 6.) For most, if not all, individuals transferring out of NRC between January 1, 2020, and December 4, 2023, median time spent at NRC was less than twenty days. (*Id.* ¶ 5.) NRC contains approximately 1,800 beds of capacity in twenty-four housing units. Each housing unit has three levels called galleries, and each gallery typically has thirteen cells. On any given day in 2025, the relevant section of NRC typically housed approximately 1,000 to 1,500 individuals. (*Id.* ¶¶ 7-8.)

The Defendants in their official capacities are the individuals holding the positions of NRC Warden, currently Mindi Nurse; and the Director of IDOC, Latoya Hughes. (*Id.* ¶¶ 9-11.) Plaintiffs are five individuals who were formerly incarcerated at NRC: Gregory Shipp, Christopher Dixon, Zachary Johnson, Darnell Brown, and Eric Tyler. They have all been transferred to other facilities or released from IDOC custody. (*Id.* ¶¶ 12-13.)

### A. <u>Vermin Infestation in Kitchen Area</u>

NRC's kitchen and food storage areas have had known problems with vermin infestation for years, including infestation from birds, insects, and mice. NRC's staff was aware of problems with vermin infestation, received complaints about the vermin, and saw both vermin and waste in multiple kitchen areas. An employee union notified NRC and IDOC leadership about concerns with vermin infestation

and requested a meeting with the former Warden to discuss those concerns. NRC leadership, including the former Warden, was aware of the ongoing vermin infestation problems. Exterminators were hired to address the vermin in the kitchen, but it did not resolve the problem. (Pls.' LR 56.1(b)(2) ¶¶ 1-5.)

Defendants have offered evidence that during 2025, NRC staff inspect and monitor food preparation and storage spaces on a regular basis, documenting whether those spaces comply with pest control policies. (Defs.' LR 56.1(a)(2) ¶ 18.) Pest and vermin control services at NRC are currently provided by Friendly Cleaner under a three-year contract authorizing $373,400 in payments. Friendly Cleaners is contracted to provide four routine pest and vermin control visits per month, as well as additional visits as necessary and appropriate to address any other pest or vermin issues that may arise. (*Id.* ¶ 19.) The Friendly Cleaner contract also imposes specific safety standards with respect to exterminations conducted in sensitive dietary areas, such as ensuring that extermination occurs only at pre-scheduled times, when food handling and dishwashing activities have ceased, food is adequately protected, and there is sufficient time for surfaces to be thoroughly cleaned and sanitized before resuming food service operations. (*Id.* ¶ 20.) Friendly Cleaner has a structural pest control license from the Illinois Department of Public Health, which authorizes a pest control company or professional to use certain restricted pesticides, with the administering professional required to pass at least two examinations before obtaining the certification. (*Id.* ¶¶ 21-22.)

Friendly Cleaner created pest management plans for NRC in October 2023, May 2024, and August 2024. In the first eleven months of 2025, Friendly Cleaner conducted pest control operations in the food preparation and storage areas of NRC on twenty-two days, including January 17 and 30; February 27; March 17; April 8, 22, and 23; May 8 and 29; June 9, 10, and 24; July 7, 8, and 30; August 24 and 28; September 16; October 13 and 27; and November 14 and 24. (*Id.* ¶¶ 23-24.) In January 2025, Friendly Cleaner assisted staff in removing five birds from dietary and otherwise treated dietary. (*Id.* ¶ 25.) In February, Friendly Cleaner checked monitoring systems near the ice prep area and other areas including the outside perimeter and surrounding docks, in addition to moving a bait box to dietary storage where rodent activity was spotted, and it deployed eleven pesticides. (*Id.* ¶ 26.) Friendly Cleaner provided general pest control services in the dietary in March 2025; in June 2025, Friendly inspected and refilled bait stations in the dietary storage areas and surrounding perimeter and treated dietary for insects; and by late November 2025, Friendly reported significant improvements of roaches in the dietary reported by both staff and inmates. (*Id.* ¶¶ 27-29.) Cleaning the dietary and food storage areas is a measure that Defendants believe will reduce the likelihood of pest and vermin investigations. (*Id.* ¶ 30.)

To prevent potential infestation by birds in NRC food storage and warehouse facilities, NRC has installed ultrasonic bird repellent devices, high velocity air curtain units over the exterior doors, plastic strip curtains on the kitchen doors to deter and block the entry of birds, and it uses nets to catch and release birds that

are found inside. (*Id.* ¶ 33.) According to a Friendly Cleaner invoice dated December 17, 2024, a sonic deterrent machine did not effectively deter sparrows, and it had malfunctioned. (Pls.' LR 56.1(b)(2) ¶ 9.)

### B. Spoiled/Contaminated Food

NRC's kitchen repeatedly failed to meet internal IDOC standards regarding the safety and sanitation of the kitchen. There was mold in the kitchen, which was known to kitchen staff. Occasionally, food was served shortly past its "Best By" or expiration date. Some Plaintiffs complained that they were served food that was undercooked, spoiled, cold, with visible mold, and/or that tasted or smelled like it was rotting. Three named plaintiffs claim that they became sick and would lose weight as a result of eating the spoiled or otherwise contaminated food. Defendants were aware of prisoners' food complaints. (*Id.* ¶¶ 6, 11-12, 15, 17-18.) The parties dispute the extent to which food was left to sit out before being served or left uncovered in refrigerators. (*Id.* ¶¶ 13-14; Defs.' LR 56.1(c)(2) ¶¶ 13-14.) Refrigerator and cooler temperature logbooks have certain entries missing. (Pls.' LR 56.1(b)(2) ¶ 25.) Records from January 2025 show that food was served one to three hours after cooking, and some food temperature records for cooked dishes are not recorded. (*Id.* ¶ 26.)

The Environmental Services Program Coordinator wrote in a June 21, 2024, memorandum to NRC's warden that in his opinion, the overall condition of NRC's kitchen is a health and safety issue that warrants special attention because it was

inconsistent with various rules and regulations. He noted that conditions appeared to have worsened since October 2022. (*Id.* ¶ 21.)

An external review by the Office of Administrative Directive Standards conducted on March 13-16, 2023, found a number of areas of noncompliance. Despite logbooks containing supervisor signatures attesting to compliance with certain cleaning requirements, the external review found noncompliant standards with respect to the following relevant areas in dietary: a leaking bathroom sink, lack of soap at a handwashing sink, missing ceiling tiles, clogged drain by dishwashing sink, missing or broken outlet covers, failing to conduct quarterly menu evaluation, and issues related to review of the food service manual. (*Id.* ¶ 22.) Plaintiffs' expert witnesses noted in an April 2024 inspection that handwashing sinks were not supplied with soap, cooked foods were left at room temperature for extended periods of time, refrigerators and freezers were not functioning correctly as a result of disrepair, and other equipment such as boilers and ovens were in a state of disrepair or were out of service. (*Id.* ¶¶ 23, 27.) Issues noted by NRC staff included broken kitchen equipment; one NRC freezer was broken in July 2023, and it remained unrepaired as of September 2023. (*Id.* ¶¶ 19-20.) There have been occasions where food service supervisors were not immediately notified if temperature records exceeded certain thresholds, and food service supervisors did not always initial temperature logs. (*Id.* ¶ 28.)

Since the end of 2023 or the beginning of 2024, the dietary facilities at NRC have been in the process of a renovation. Starting in or around August 2024, IDOC

began renting a modular mobile kitchen complex to serve as a temporary kitchen to ensure that food service operations continue without interruption during the renovation. The modular complex contains newly obtained ovens, dishwashers, grills, fryers, ovens, skillets, sinks, dishwashing equipment, and other cooking equipment. The cost of the rented kitchen complex is $225,410 per month, and the Department has also rented multiple twenty-foot walk-in refrigeration/freezer units to replace the refrigeration and freezer facilities currently undergoing renovation. (Defs.' LR 56.1(a)(2) ¶¶ 14-15, 34-36.) Dishwashers were not yet operable as of October 2024 while plumbing work was being completed. (Pls.' LR 56.1(b)(2) ¶ 33.) During the renovation, a dining room adjacent to the old NRC kitchen is used for meal tray preparation and certain dry storage areas will be used for the storage of food, spices, and kitchen supplies. (Defs.' LR 56.1(a)(2) ¶ 16.)

Since the mobile kitchen has been in use, perishable food is stored either in (1) NRC's warehouse and its industrial refrigerators and freezers located just outside NRC, or (2) in the rented freezers and refrigerators located adjacent to the temporary kitchen trailers. (*Id.* ¶ 38.) NRC supervisors record the temperatures of refrigerators and freezers at various times throughout the day. (*Id.* ¶ 39.) The Dietary Production Commodity Control Log completed and signed by NRC supervisors and staff includes an entry for each menu item that records the initial temperature of each food item after it is cooked or prepared, and the temperature of each food item when it is packed to be served, including for any special or therapeutic meals. (*Id.* ¶ 40.) Food trays are packed into insulated carts for

transport from the NRC kitchen facilities to housing units for distribution. New insulated food warming and delivery carts were purchased in the fourth quarter of 2024. (*Id.* ¶¶ 41-42.)

The dietary control log also requires food service supervisors and professionals on duty to: list menu items to be served, together with the portion size for each menu item; sample items on the menu; provide details regarding any "special diets" prepare during meal service, such as whole all or low-sodium meals; identify the number of individuals in custody and staff served; provide the temperature of the water used to (1) wash after cooking, (2) rinse, and (3) sanitize; inspect the individuals in custody doing food preparation work for compliance with policies prior to the shift; calibrate their temperature-testing thermometer prior to the shift; sign off that the comprehensive cleaning schedule was followed after a shift; and inspect hand-washing stations after a shift. (*Id.* ¶ 43.)

The Department has promulgated Administrative Directive 05.02.142 (on "Food Service Sanitation and Safety Operations"), which imposes detailed sanitation requirements related to food preparation, including requiring handwashing, preventing individuals who may be six from preparing food for persons in custody, requiring compliance with Illinois Department of Public Health regulations, ensuring proper temperature control, and generally requiring supervision of food preparation by an appropriately certified food service professional. (*Id.* ¶ 45.)

Each time a meal is prepared in NRC kitchens, a Dietary Production Commodity Control Log is completed. The log includes an entry that must be signed by a supervisor, "Ensuring the Comprehensive Cleaning Schedule Followed." (*Id.* ¶¶ 31, 37.) NRC has also promulgated a "Mobile Kitchen Deep Cleaning Schedule" to deep-clean the various kitchen facilities, such as dry storage, coolers/freezers, and dock areas, on a regular schedule, from one to three times per week. (*Id.* ¶ 32.)

**C. <u>Out-of-Cell Time</u>**

NRC's policies require it to provide a minimum of eight hours of recreation time per week, and IDOC policy requires people in custody to receive between ten and twenty hours of out-of-cell time per week. (Pls.' LR 56.1(b)(2) ¶¶ 37-38.) Due to its nature as an intake center, NRC does not have the same educational, occasional, and other enrichment opportunities or programming as long-term prisons do. (*Id.* ¶ 39.) In or around September 2023, NRC was unable to offer yard "on more occasions than not" due to staff shortages. Security staffing shortages were estimated to result in canceling yard once or twice a week between 2021 and September 2023. (*Id.* ¶¶ 41-42.)

NRC schedules yard time on a three-day cycle between the three galleries. (Defs.' LR 56.1(a)(2) ¶ 46.) Yard time was offered to individuals in custody on 115 out of 184 days in March, April, May, August, September, and October 2025, including offers of yard time to those in Gallery 1 on at least thirty-four days in this period, to Gallery 2 on at least forty days in this period, and to Gallery 3 on at least thirty-four days in this period. (*Id.* ¶ 47.) On days in which NRC offered yard, the

number of individuals in custody taking advantage of yard time varied. For example, on March 8, 2025, only 108 individuals out of those housed in Gallery 1 accepted the offer of yard time; but on August 10, 2025, 425 individuals out of those housed on Gallery 3 accepted the offer of yard time. (*Id.* ¶ 48.) Yard was not held for a number of reasons from March to October 2025, including ten days due to weather; twenty-two days due to the activities of the parole board; two days due to lack of staff; no yard time was scheduled on nine days; and yard was not held or was cancelled for unspecified reasons on twenty additional days. (*Id.* ¶¶ 79-80.) Each shift report documents whether yard time was provided during the 7:00 a.m.-11:00 a.m. shift, and most shift reports also disclose (1) which galleries received yard, and (2) how many individuals accepted the opportunity to have yard. The shift activity reports also indicated whether yard was not offered, and if that occurred, most such reports provided a reason as to why yard was not offered. Out of a 184-day period, data was missing or illegible for six days. (*Id.* ¶ 50.)

Of sixty-four days in December 2024 through February 2025, NRC provided yard only on seventeen days, and the occurrence and duration of yard was inconsistent and varied across units, leading to galleries experiencing significant data gaps in different opportunities for yard. (Pls.' LR 56.1(b)(2) ¶ 48.) Over ninety-two days from August to October 2025, Gallery 1 had seventeen days of yard time; Gallery 2 averaged twenty-two days; and Gallery 3 averaged twenty-three days. During that period, Gallery 1 averaged five to six days between yard, and Galleries 2 and 3 averaged four to five days between yard. (*Id.* ¶ 47.)

Individuals at NRC in 2025 also received additional out-of-cell time for showers on a rotating schedule, with schedules staggered so that an individual would have either yard time or shower time on many days while at NRC. (Defs.' LR 56.1(a)(2) ¶ 51.) Former Warden Gomez was aware of prisoner complaints regarding deficient out-of-cell time at NRC. (Pls.' LR 56.1(b)(2) ¶ 40.)

### D. <u>Water Contamination</u>

NRC's water system is considered a "Public Water System," which is an entity subject to certain regulations under Illinois and federal law. NRC acquires its water from the supply of the City of Crest Hill, the municipality adjacent to the Stateville/NRC campus. The water supply to NRC is taken from the same wells that serve residents of Crest Hill and other local customers, including a nearby Illinois State Police building. NRC staff do not treat the water acquired from Crest Hill. Instead, all water treatment is conducted by Crest Hill, which (1) removes iron, (2) applies gas chlorination to achieve a free available chlorine disinfectant residual concentration, (3) applies hydrofluosilicic acid to achieve the desired fluoride level, and (4) applies polyphosphate as a sequestering agent for corrosion control. (Defs.' LR 56.1(a)(2) ¶¶ 52-55.)

Approximately fourteen people on the Stateville campus are involved in water system inspection, testing, maintenance, and repair, including seven plumbers and the chief engineer. In addition, a number of outside vendors are or have been engaged to provide support services related to the operation, maintenance, and testing of the water supply system, including: a water services

vendor to provide a Responsible Operator in Charge ("ROINC") and certain water sampling services; and engineering company to investigate lead and copper in campus building water systems; and the University of Illinois Sustainable Technology Center, which conducts water sampling and analysis for Legionella. (*Id.* ¶¶ 56-57.)

Under applicable regulations, NRC's water system is required to be supervised by an appropriately licensed and certified ROINC, and the ROINC is jointly responsible with NRC for the proper operation of the NRC water system. Nicholas Gornick, a licensed water professional, currently serves as the ROINC for NRC. (*Id.* ¶¶ 57-59.)

NRC is required by law to establish a cross-connection control program, a set of documented policies and practices designed to help prevent the entry of contaminants into the drinking water system. To create the current cross-connection control program, NRC conducted a cross-connection control survey in 2023, and NRC is not required to conduct any additional cross-connection control survey until 2026. NRC has two plumbers on staff who are certified to serve as cross-connection device inspectors. In 2023, the Illinois EPA acknowledged that NRC developed and instituted a comprehensive cross-connection control program. (*Id.* ¶¶ 61-63.)

In 2023, the Illinois EPA acknowledged that NRC had established an emergency operations plan, as required by law, describing the actions that will be taken should NRC lose water service. (*Id.* ¶¶ 64-65.) Building "water management

programs" are intended to identify potentially hazardous conditions and outline steps to minimize the health impact of waterborne pathogens. Building water management plans are defined by the International Association of Plumbing and Mechanical Officials as documents that contain "a description or procedures associated with the normal operation, shutdown, maintenance, and start-up of building water systems." Building water management programs and building water management plans are recommended, but not required, by federal and state regulators. NRC has created both a building water management program and a building water management plan. (*Id.* ¶¶ 66-69.)

NRC should monitor for potentially harmful levels of six potential contaminants so that it can undertake appropriate remediation efforts if issues as to these contaminants are detected: (1) chlorine, (2) bacteria (including coliforms and *E. coli*), (3) *Legionella*, (4) trihalomethanes (also referred to as "disinfectant byproducts"), (5) lead, and (6) copper. (*Id.* ¶ 70.) Chlorine is added to drinking water to protect against microbial contaminants, to act as an indicator of issues in the distribution system, and to limit the potential growth of bacteria and *Legionella*. Federal regulations require that NRC maintain chlorine levels between 0.5 and 4.0 mg/L, but NRC has established a more restrictive policy to try to keep chlorine levels between 1.0 and 4.0 mg/L. NRC staff monitor chlorine levels daily by testing the water entering the facility from Crest Hill and by conducting additional daily chlorine testing of water in other areas of the facility. If NRC staff assess the chlorine levels are trending too low or too high, they contact Crest Hill water

personnel and request that they adjust the chlorine content of the water being provided NRC. (*Id.* ¶¶ 71-73.)

In 2023, the Illinois EPA acknowledged that NRC had developed a procedure to ensure the chlorine residual levels are checked and logged daily to help ensure the minimum chlorine residual level is being met in all portions of the distribution system at all times. (*Id.* ¶ 74.) NRC's chlorine levels have been generally maintained within applicable regulatory limits, but in 2022-24, they fell below the federally mandated minimum on a number of occasions. (*Id.* ¶ 75; Pls.' LR 56.1(b)(2) ¶¶ 60, 66, 68.) Recent testing shows that NRC chlorine levels generally remained within regulatory limits in 2025, with average monthly free chlorine values measured at the NRC water tower in 2025 ranging between 1.59 and 2.75. (Defs.' LR 56.1(a)(2) ¶ 76.)

NRC also tests the water supply for bacteria. Recent testing shows that bacteria/coliform/*E. coli* levels have remained within regulatory limits. (*Id.* ¶¶ 77-78.) *Legionella* is a bacteria that can cause Legionnaires' disease (a type of pneumonia) and Pontiac fever (a mild respiratory disease). Neither federal nor Illinois law establishes binding regulations specifically applicable to *Legionella*. Instead, several trade associations have issued advisories on *Legionella*, defining threshold at which levels are considered adequately controlled such that only ongoing monitoring is necessary, as well as levels at which they advise more aggressive action. Similarly, the CDC has defined advisory thresholds at which *Legionella* is considered "well-controlled," "poorly controlled," and "uncontrolled."

NRC tests a variety of locations for the presence of *Legionella*. While *Legionella* was detected in eighteen of forty-two samples collected from March 2022 to March 2023, testing since that time shows that Legionella was only detectable at NRC in December 2023, and it has never required more than ongoing monitoring. (*Id.* ¶¶ 79-82; Pls.' LR 56.1(b)(3) ¶ 82.)

Trihalomethane contaminants can be produced as a byproduct of chemical disinfection of drinking water, and the total amount of trihalomethanes in water is monitored because of its potential health impact. Under applicable regulations, NRC is required to test for total trihalomethanes ("TTHM") levels on a periodic basis and may be in violation of regulatory limits if the arithmetic mean of the TTHM levels from tested samples exceeds 80 ppb, or 0.080 mg/L. NRC did not conduct required TTHM testing in 2021. Since 2021, NRC trihalomethanes testing has complied with applicable regulations, and there have not been any instances in which NRC trihalomethanes levels have violated regulatory limits since then. (Defs.' LR 56.1(a)(2) ¶¶ 83-86.)

Lead is an element present in some water infrastructure, such as piping, which under certain conditions can leach into the water supply and cause negative health repercussions. Under applicable regulations, NRC is required to monitor for lead by twice annually drawing water samples from twenty locations approved by the Illinois EPA and delivering the samples to an appropriate laboratory for testing and submission to the Illinois EPA. An "action level exceedance" with respect to lead only occurs if the 90th percentile of these measurements exceeds the "action

level," defined as 0.015 mg/L. Exceeding a lead action level is not inherently a regulatory violation; however, failure to initiate additional requirements after an action level exceedance may trigger a violation. Water tests in October and November 2021 and in September 2023 showed lead action level exceedances. In response to the 2021 lead testing results, the Department collaborated with the Illinois EPA and the Illinois Rural Water Association to change the NRC lead testing program, including by implementing updated testing locations with the approval of regulators. (*Id.* ¶¶ 87-92; Pls.' LR 56.1(b)(2) ¶¶ 74-76.)

Excessive copper can impact health, and copper may enter drinking water after being released from metal in building plumbing components. NRC is required to monitor copper levels twice annually by drawing water samples from twenty locations approved by the Illinois EPA. An "action level exceedance" with respect to copper only occurs if the 90th percentile of these twenty measurements exceeds the "action level," defined as 1.3 mg/L. Exceeding an action level as to copper is not a violation; however failure to initiate additional requirements after an action level exceedance occurs may trigger a violation. Tests revealed copper exceedances at various times and locations in 2019-22, but there were no additional action level exceedances with respect to copper from then to the end of 2024. Water testing conducted in 2025 showed an action level exceedance for copper. As a result of these exceedances, on July 23, 2025, the Illinois EPA issued a "Special Exception Permit" instructing NRC staff to take certain steps related to the remediation of copper. Four of those requirements were due by January 1, 2026, and NRC documented

their completion on December 31, 2025: (1) submission of a Source Water Treatment Recommendation, (2) source water sample collection, (3) water quality distribution and entry point sample collection, and an optimal corrosion control treatment recommendation. Three additional steps were not required to be completed until additional time has passed, after the date of the filing of the summary judgment motion. (Defs.' LR 56.1(a)(2) ¶¶ 93-100; Pls.' LR 56.1(b)(2) ¶¶ 79-82.)

On June 1, 2023, the Illinois EPA and the Department entered into a Compliance Commitment agreement to resolve certain findings of violations by the Illinois EPA relating to NRC water issued on January 9, 2023. The Illinois EPA and the Department have agreed to a January 1, 2027, deadline for the Department to complete the final tasks listed on the January 1, 2023, CCA (related to the NRC water tower), and the Department has completed all other requirements. In late 2025, Illinois EPA personnel conducted an inspection of NRC water infrastructure, identified several deficiencies, and issued a Corrective Action Plan Acceptance document approving a remediation plan containing two elements: NRC "has until March 7, 2026" to (1) "install [a] water level monitor" in the NRC elevated water tank and (2) "repaint the tank." (Defs.' LR 56.1(a)(2) ¶¶ 101-03; Pls.' LR 56.1(b)(2) ¶¶ 70-71.)

**E. <u>Nutritional Adequacy of Baseline Diet</u>**

The Department retains the services of a licensed dietitian. The Department has created a multi-week master menu that applies to NRC, and that menu is reviewed annually by the dietitian. Under IDOC policy, facility staff overseeing

meal preparations are authorized to make substitutions to the menu. (Defs.' LR 56.1(a)(2) ¶ 106.) NRC kitchen staff frequently departed from the standard menu and substituted some foods for others. (Pls.' LR 56.1(b)(2) ¶ 97.) Food that was substituted was not assessed for caloric value to ensure replacement items matched the caloric value of the items on the menu. (*Id.* ¶ 98.) An expert who evaluated the substitutions concluded that they appeared to be nutritionally appropriate. (Pls.' LR 56.1(b)(3) ¶ 106.)

On June 27, 2025, the Department dietitian completed a comprehensive menu analysis for the FY2026 5-Week Master Menu. The dietitian's analysis indicated that the FY2026 Menus supplied the following average daily nutrient values: 2524 cal; 351 g of carbohydrates; 1404 cal from carbohydrates; 82 g of lipids; 734 cal from lipids, with 29% of calories being derived from lipids; 108 g of protein; 430 cal from protein, with 17% of calories being derived from protein; and 3772 mg of sodium. The dietitian certified that it was her "professional opinion that this menu meets and exceeds nutrition needs for the [Department's] general population." In 2024, the dietitian completed a menu analysis for the FY2025 master menu, which indicated that the menus supplied the following average daily nutrient values: 2161.46 cal; 297.36 g of carbohydrates; 1188 cal from carbohydrates, with 55% of calories being derived from carbohydrates; 73.69 g of lipids; 657 cal from lipids, 30% of calories being derived from lipids; 83.23 g of protein; 332 cal from protein, 15% of calories being derived from protein; and 3913.91 mg of sodium. In 2024, the Department dietitian determined that in her

opinion, the FY2025 menu met "the national dietary guidelines for the Illinois Department of Corrections general population." (Defs.' LR 56.1(a)(2) ¶¶ 104-11.) Prisoners, however, have complained that the food at NRC did not provide sufficient calories, and NRC staff was aware of those complaints. (Pls.' LR 56.1(b)(2) ¶ 96.)

The Department has created a Therapeutic Diet Manual and program to provide specialized diets to those in need, including diets for: (1) pregnancy and lactation; (2) end of life; (3) texture modified diets for persons facing various types of difficulties in chewing or swallowing; (4) liquid diets; (5) heart-healthy diets; (6) sodium restricted diets; (7) "consistent carbohydrate" diets; (8) diets to address chronic kidney disease; (9) high calorie and high protein diets; (10) gluten-free diets; and (11) religious diets such as kosher, Halal, and vegetarian. (Defs.' LR 56.1(a)(2) ¶ 112.) The 2020 dietary guidelines establish the following daily nutritional goals for men ages nineteen and older:

| | Ages 19-30 | Ages 31-50 | Ages 51+ |
|---|---|---|---|
| Calories | 2400 | 2200 | 2000 |
| Protein (g) | 56 | 56 | 56 |
| Carbohydrates (g) | 130 | 130 | 130 |
| Carbohydrate (% kcal) | 45-65% | 45-65% | 45-65% |
| Total Lipid (% kcal) | 20-35% | 20-35% | 20-35% |

(*Id.* ¶ 113.)

The federal government has measured the average intake of sodium for persons aged one year and older to be 3393 mg per day, with a range of about 2000 to 5000 mg of sodium per day, an average daily intake of sodium for adult males ages nineteen through thirty of 4274 mg, for adult males ages thirty-one through

fifty-nine of 4172 mg, and for adult males ages sixty and over of 3799 mg. (*Id.* ¶ 114.)

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where, drawing all reasonable inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Metzler v. Loyola Univ. Chi.*, 164 F.4th 612, 616 (7th Cir. 2026) (quotations omitted); *see* Fed. R. Civ. P. 56(a). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) ("Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied.").

In evaluating a motion for summary judgment, courts must "take the facts in the light most favorable to the non-moving party" and avoid making factual determinations or weighing conflicting evidence. *Gupta*, 19 F.4th at 996-97; *see Zemlick v. Burkhart*, 164 F.4th 1004, 1010 (7th Cir. 2026) ("We do not weigh evidence or make credibility determinations—those tasks are entrusted to the factfinder."). However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as

to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 973 (7th Cir. 2020) ("'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'") (quoting *Anderson*, 477 U.S. at 252).

## IV. ANALYSIS

The Eighth Amendment's prohibition against cruel and unusual punishment "'does not mandate comfortable prisons,' . . . but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). The constitution thus "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* (citation omitted).

An official violates the Eighth Amendment only when two elements are met: (1) an objective requirement that the alleged deprivation is "sufficiently serious," meaning that the act or omission results denies the prisoner "the minimal civilized measure of life's necessities"; and (2) a subjective requirement that a prison official has a "sufficiently culpable state of mind," or "deliberate indifference to inmate health or safety." *Id.* at 834 (citation omitted); *see Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) ("Deliberate indifference is a subjective mental state; the official

must have actually known of and consciously disregarded a substantial risk of harm.").

"Deliberate indifference is more than mere negligence or carelessness: it is 'something approaching a total unconcern' for inmate safety." *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (citations omitted). However, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842; *see also Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016) ("A plaintiff need not prove that his complaints were literally ignored; rather, he must show only that defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs.") (cleaned up, citations omitted).

Even unsuccessful measures can defeat a claim of deliberate indifference if prison officials' "reasonable effort to address a known risk of harm shows that they did not recklessly disregard that risk." *Rasho*, 22 F.4th at 706, 710 ("Similarly, 'the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.'") (citation omitted); *see Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). But "knowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer

deliberate indifference." *Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016); *see Rasho*, 22 F.4th at 710 (describing "the well-settled principle that while a single negligent act cannot support an inference of deliberate indifference, persistence in a course of action known to be ineffective can").

Defendants generally do not dispute that the deprivations alleged by Plaintiffs are objectively serious but point to infrastructure and/or procedures – including a number of relatively recent changes – that they believe show reasonable and appropriate responses to the conditions, negating deliberate indifference.

Plaintiffs read Defendants' central argument as one of mootness, *i.e.*, that because any deficiencies have been remedied, Plaintiffs' claims are moot. Plaintiffs, however, misread the defense, which instead maintains that because Defendants have tried to remedy the conditions, Plaintiffs cannot show deliberate indifference, and thus there is no Eighth Amendment violation. While there is some conceptual overlap between the two positions, there is no reason to recraft a defense to deliberate indifference into a mootness argument. Under Plaintiffs' theory, all deliberate indifference defenses based on changed circumstances should be examined under the mootness standard, yet Plaintiffs are able to offer only one out-of-circuit case in support.

Moreover, *Farmer* itself explains that a deliberate indifference claim can be defeated through post-filing conduct, with no reference to mootness:

> [T]o survive summary judgment, [a plaintiff] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, *and are at the time of summary judgment*, knowingly and unreasonably disregarding an objectively intolerable risk

> of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

*See Farmer*, 511 U.S. at 846 (emphasis added). "[E]ven prison officials who had a subjectively culpable state of mind when the lawsuit was filed could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation." *Id.* at 847 n.9. The Court therefore will evaluate Defendants' post-filing conduct under the deliberate indifference standard.[3]

### A. <u>Vermin Infestation in Kitchen Area</u>

Defendants argue that they have engaged in extensive efforts to eliminate pests and vermin from the kitchen and food storage areas, including renovating the

---

[3] Plaintiffs also object to Defendants' reliance on discovery produced after the December 2024 fact discovery deadline. These materials are predominantly business records, such as logs, reports, testing records, menus, and invoices. Plaintiffs do not contend that the documents were not produced at all, only that they were produced after the deadline. *Cf.* Fed. R. Civ. P. 37(c)(1).

Plaintiffs' complaint, however, disregards that their own document requests demanded ongoing production: "These Requests shall be deemed continuing so as to require further supplemental production by you—to the full extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure—in the event you obtain or discover additional information between the time of initial production and the time of hearing or trial." (*See, e.g.*, Pls.' Mem. in Supp. of Mot. to Compel, Ex. A at 6). Plaintiffs' alternate request for additional discovery fails to comply with Rule 56(d), which requires the nonmovant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The Court will therefore consider the 2025 evidence offered by Defendants. *See Farmer v. Brennan*, 81 F.3d 1444, 1449 (7th Cir. 1996) ("As is true for most matters relating to discovery, the district court has substantial discretion in ruling on a Rule 56([d]) motion, and this Court therefore reviews its decisions only for abuse of discretion.").

kitchen; leasing trailers and new equipment in the interim; contracting with a credentialed extermination service to inspect and treat those areas on average twice a month; routinely cleaning food prep areas during every shift and deep cleaning all areas on a regular schedule; and implementing various measures to keep birds out of food areas.

Plaintiffs respond that there are disputed issues of fact as to whether Defendants' efforts have been reasonable. They note that the kitchen was beset by infestations for years, and maintain that Defendants' belief that the kitchen renovations "can be expected" to prevent pest infestations is speculative at best, as pest control professionals were also used in the past to no avail. Plaintiff also questions whether the mere existence of kitchen cleaning policies and practices means they will be followed.

Plaintiffs arguments almost exclusively relate to the former kitchen at NRC, suggesting that what's past is prologue, and speculating that improved pest control will not continue in the new facilities. Plaintiffs' argument disregards the fact that Defendants' focus on the problem and significant expenditure of resources in the effort to resolve it is almost the definition of taking "measures reasonably calculated to address the risk" Plaintiffs face, and thus "they cannot be held liable." *See Hunter*, 73 F.4th at 566. This is true even if Defendants are not completely successful in eliminating all vermin. *See Farmer*, 511 U.S. at 844.

**B. Spoiled/Contaminated Food**

Defendants also offer NRC's kitchen renovations (and the current temporary mobile kitchen and rented refrigeration/freezer units) as proof of their efforts to mitigate the problem of food spoilage and contamination. In addition, they describe the implementation of new temperature controls, cleaning procedures, and logs to monitor compliance with those measures.

Plaintiffs dispute whether the new kitchen will adequately improve food safety and accuse Defendants of engaging in speculation that the renovations will be effective. Plaintiffs point out, for example, that the only renovation work on the walls and ceilings is expected to be patching and repair, although they appeared to be impacted by fungal growth. Plaintiffs also challenge that the new procedures for kitchen cleaning or temperature control will be followed, and thus it cannot be said that the practices are reasonable.

As with pest control, the Court concludes the undisputed facts show that Defendants' efforts pass constitutional muster. Although the ultimate success of the renovations and updated procedures remains to be seen, they have not recklessly disregarded the problem. *Rasho*, 22 F.4th at 711 (citation omitted) ("It is always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm.").

**C. Out-of-Cell Time**

Defendants cite the heavy burden of demonstrating that out-of-cell time is so restricted that it amounts to a constitutional violation. *See Antonelli v. Sheahan*, 81

F3d 1422, 1432 (7th Cir. 1996) ("Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened."); *see also Thomas v. Ramos*, 130 F.3d 754, 763-64 (7th Cir. 1997) (finding no Eighth Amendment violation where the plaintiff could exercise in his cell and was able to occasionally walk to the medical unit). Plaintiffs respond that prison officials are deliberately indifferent when they fail to address insufficient out-of-cell time despite the complaints and requests from prisoners.

Plaintiffs mistakenly equate less-than-ideal yard time with an unconstitutionally deficient amount of exercise afforded the inmates. First, Plaintiffs have offered no evidence that, on a class-wide basis, their health was threatened by the amount of time in cells, and thus they have failed to meet the objective prong of the *Farmer* test. Furthermore, by Plaintiffs' own calculations, they received yard every four to six days; as a matter of law, this is not an unconstitutional level of time outside their cells. *See Thomas*, 130 F.3d at 764 ("Although prison authorities cannot indefinitely prevent an inmate from receiving exercise outside of their cell because of scheduling conflicts, the Eighth Amendment would not be violated where such a conflict occurred for only a few weeks.").

### D. Contaminated Water

Defendants move for summary judgment on the claim of contaminated water based on its comprehensive water safety system, including manpower, processes, and testing, which complies with applicable regulations. To the extent that

regulatory failures have occurred, Defendants argue they have acted appropriately to remediate any problems. Plaintiffs do not dispute that Defendants have implemented policies and procedures to address water quality or that they have dedicated staff on-site, but they question whether such procedures will actually be followed and whether they will be effective. Plaintiffs contend there is a disputed issue of fact about NRC's water quality as a whole, pointing out a number of tests over the years revealing chlorine and/or contaminant levels that were not at acceptable levels. According to Plaintiffs, Defendants' actions constitute deliberate indifference because they are only intermittent and reactive, ignoring known risks until being forced by regulators to deal with the problem.

"[F]ailing to provide a maximally safe environment, one completely free from pollution or safety hazards" does not violate the Eighth Amendment, which "does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *See Carroll v. DeTella*, 255 F.3d 470, 472-73 (7th Cir. 2001) (explaining further that there can be no constitutional violation if agencies responsible to control hazards do not see fit to impose remedial measures). The undisputed facts show that NRC has created a comprehensive water safety system and other procedures to maintain water quality, and that they have dedicated staff to address the issue, but sometimes contaminants are nevertheless present. The facts also show that NRC has complied with Illinois EPA directives when necessary. Plaintiffs' suspicion that NRC might not comply with measures whose deadline has not passed is certainly

insufficient to create an issue of fact about whether NRC may be deliberately indifferent in the future. Plaintiffs' concern that NRC may at some point stop testing regularly or otherwise stop following the policies is similarly misplaced. The argument suggests that nothing shy of a consent decree can defeat summary judgment, but that is not what the law requires.

### E. <u>**Nutritional Adequacy of Baseline Diet**</u>

Defendants contend that Plaintiffs' claims of inadequate nutrition fail both the objective and subjective prongs of the deliberate indifference test: the meal is objectively adequate, and Defendants have taken steps to ensure that the menu is nutritionally appropriate for the average man. Plaintiffs respond that the diet is calorically deficient, and staff often make substitutions to the planned menu, making assessment of those deviations impossible to evaluate.[4]

It is possible, if not likely, that many class members believe the meals at NRC do not provide enough calories. But the unrebutted evidence in the record shows that the menus prepared under the guidance of a registered dietitian provide total calories in the acceptable range of dietary guidelines, with the proportion of macronutrients also in acceptable ranges. *Williams v. Shah*, 927 F.3d 476, 481 (7th Cir. 2019) (concluding the master menu providing 2200 to 2400 calories per day was sufficient to defeat *Farmer*'s objective prong, "because the record establishes without dispute that the plan was formulated to provide adequate nutrition"); *see Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) ("If under contemporary

---

[4] Plaintiffs also argue that the food is spoiled or otherwise inedible, but that issue is addressed in Section IV.B. above.

standards the conditions cannot be said to be cruel and unusual, then they are not unconstitutional."). If a prisoner has particular dietary requirements, including the need for higher calorie meals, NRC can accommodate those needs. Finally, although substitutions are made for a number of reasons, Plaintiffs have not offered any evidence rebutting the expert who opined that the substitutions evaluated appeared to be nutritionally adequate.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 201] is granted, and Defendants' Motion to Exclude Expert Testimony and Reports of Dr. Mitchel K. Holliday [Doc. No. 203] is denied. Civil case terminated.

**SO ORDERED.** **ENTERED:**

**DATE:** **September 28, 2026**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**